**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LEEDSWORLD, INC.,          )
                                 )
               Plaintiff,     )
                                 )
v.                             )     2:25-cv-00220
                                 )
RACHEL HARE, et al.,        )
                                 )
             Defendants.   )
                                 )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Plaintiff Leedsworld, Inc.'s ("Plaintiff") Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 2). Plaintiff requests an injunction that would prevent one of its former employees—Defendant Rachel Hare—from working for Defendant iClick Inc. ("iClick") "or any other business that competes with any business that Leedsworld or Polyconcept North America, Inc. ("PCNA") conducts." (ECF No. 17-1). The requested injunction would also enjoin the Defendants from "retaining, using, disclosing, or transmitting the confidential information of PCNA or Leedsworld for any purpose." (ECF No. 17-1).

For the reasons discussed herein, Plaintiff's Motion is DENIED. A preliminary injunction will not issue.[1]

---

[1] Defendants' Motion to Strike (ECF No. 22) is also pending before the Court. Because the Court was able to resolve the Motion for a Preliminary Injunction without reference to the disputed materials, the Court need not reach the merits of the Motion to Strike. Accordingly, Defendants' Motion to Strike (ECF No. 22) is DISMISSED AS MOOT. Further, the matters set out in this Opinion constitute the Court's findings of fact and conclusions of law for purposes of Fed. R. Civ. P. 52.

## I.    Background and Findings of Fact

1.    At the evidentiary hearing held on February 28, 2025, all witnesses—William Peterson, Jeffrey Roberts, and Rachel Hare—testified credibly.

2.    Leedsworld, Inc. is a subsidiary of Polyconcept North America ("PCNA").[2]

3.    PCNA is a leading promotional-products supplier. It sells hard goods, value-added brands, custom apparel, journal books, and other products to customers throughout the United States; those customers are generally other businesses in need of customized promotional products.

4.    In 2024, PCNA generated approximately $650 million in revenue.

5.    PCNA's business from technology products accounts for ten to fifteen percent of PCNA's revenue, and approximately sixty percent of PCNA's revenue from technology products is generated from audio products. Audio products are things such as ear buds, headphones, and Bluetooth speakers.

6.    PCNA and its affiliated companies (collectively, "PCNA corporate family") conduct business in many countries across multiple continents.

7.    PF Concepts is one member of the PCNA corporate family. It operates in Europe.

8.    PCNA's customers are "distributors" who order promotional products from PCNA and then sell them to the ultimate end-user.

9.    The identities of distributors in the promotional-products industry are generally known by suppliers in the industry.

---

[2] While Leedsworld is technically a subsidiary of PCNA, the Parties (and apparently the entities involved) use the names interchangeably.

10.     iClick is also a supplier of promotional products, primarily focusing on mobile technology. Since 2019, iClick has done business with over 38,000 sales representatives across 13,000 companies.

11.     iClick is a much smaller company than PCNA. In 2024, iClick's revenues were $14.1 million. Approximately sixty percent of this comes from products for which iClick has exclusive dealing contracts. iClick's revenue from audio products was around $200,000 to $300,000 in 2024.

12.     Ms. Hare was hired by PCNA on December 3, 2012 as a Field Sales Manager in PCNA's Midwest sales region.

13.     Prior to joining PCNA, Ms. Hare had worked in the promotional products industry for about a decade.

14.     As Field Sales Manager, Ms. Hare's responsibilities were limited to selling PCNA's products to a finite list of customers, all of whom were located in the Midwest region of the United States.

15.     Though it fluctuated during Ms. Hare's tenure, the Midwest region generally included Illinois, Wisconsin, Indiana, Michigan, and Ohio. At some times, Texas was included in her region, and at other times, Tennessee and Florida were included in her region.

16.     In May 2021, Ms. Hare became the National Account Manager for three of PCNA's larger accounts: Staples, Corporate Imaging Concepts ("CIC"), and Taylor Corporation.

17.     William Peterson, the Vice President of Sales at PCNA and Ms. Hare's supervisor, testified that:

    a.  PCNA's business with Staples occurs throughout the United States and Canada;

    b.  PCNA's business with CIC occurs throughout the United States; and

c.  PCNA's business with Taylor Corporation occurs in the Midwest region.

18.    As National Account Manager, Hare was responsible for implementing strategy to grow these accounts.

19.    While she was National Account Manager, Ms. Hare participated in regular meetings of the "Large Order Council" at which Hare and the other council members would discuss PCNA's largest orders.

20.    In June 2023, Ms. Hare was offered a promotion to a Regional Sales Manager position. A few days after the offer was extended and after engaging in some salary negotiations, Ms. Hare accepted PCNA's offer.

21.    While seeking this promotion, Ms. Hare boasted in an email that she had strong relationships with sixty percent of PCNA's customer base. Ms. Hare testified that she had relationships with sixty percent of PCNA's customers in the Midwest region, not worldwide. Ms. Hare's testimony generally on these matters, and specifically on those self-supporting assessments, was not contradicted by PCNA.

22.    Ms. Hare executed a "Nondisclosure, Inventions, Non-Competition and Non-Solicitation Agreement" ("Employment Agreement") with PCNA.  The Employment Agreement was dated June 7, 2023.

23.    The Employment Agreement contained a covenant not to compete, a covenant not to solicit PCNA customers, and a covenant not to use or disclose PCNA's proprietary information.

24.    The Employment Agreement stated that Ms. Hare assumed these additional obligations "[i]n consideration of the Company's agreement to employ Employee in an at-will capacity in the position of 'Regional Sales Manager' and other good and valuable consideration as set forth herein."

4

25.    Ms. Hare's transition from National Account Manager to Regional Sales Manager was a promotion. Along with this promotion, Ms. Hare's compensation was to be, and ultimately was, increased.

26.    Ms. Hare was Regional Sales Manager for the Midwest region.

27.    In her various roles at PCNA, Ms. Hare's role centered around developing and maintaining relationships with client companies for the purpose of generating and increasing market share and revenue on behalf of PCNA.

28.    In her various roles at PCNA, Ms. Hare interfaced with the PCNA's customers. Those customers were in essence "wholesalers" of the branded promotional products PCNA would cause to be produced. Those customers would in turn supply those products to the business purchasers of the promotional products, who would use them with their own customers. The account executives and customer representatives with whom Ms. Hare interacted with were concentrated in the Midwest Region, although some of the corporate customers did business nationwide.

29.    During her time at PCNA, Ms. Hare had access to some of PCNA's business information, some of which was represented by PCNA to be, and would appear to likely be, confidential and proprietary information. For example:

   a.   Ms. Hare had access to PCNA's business analytics tools and customer relationship manager. These tools contained detailed information about all of PCNA's customers, including revenue data and sales targets.

   b.   Ms. Hare received monthly report that included detailed, customer-level information about sales.

    c.   By virtue of her role on the "Large Order Council," Ms. Hare was privy to conversations about PCNA's strategy vis-à-vis its larger customers.

    d.   At national sales meetings, Ms. Hare would hear information about what products were most popular.

    e.   Ms. Hare herself testified that she had access to "a whole lot" of information.

30.    PCNA took measures to keep this information private. It used employment agreements containing confidentiality provisions and covenants not to compete, and the employee handbook discussed confidentiality responsibilities.

31.    In 2024, PCNA modified its compensation structure to include more variable pay. Under the old structure, sales employees—like Ms. Hare—earned commission on every dollar of product sold. Such commission vested and was payable to the salesperson immediately. Under the new structure, while compensation was earned on every dollar sold, it would not vest (i.e., would not be payable to the salesperson) unless that employee came within fifteen percent of their sales target. Mr. Peterson testified that this new compensation structure increased both upside opportunity and downside risk for employees.

32.    Implementation of the modified compensation structure was delayed until 2025 out of concern that employees would be unable to meet sales targets because of economic headwinds impacting PCNA's business in a more general fashion.

33.    Ms. Hare testified that she believed the new compensation structure would meaningfully decrease her compensation.

34.    On February 7, 2025, Ms. Hare informed her direct supervisor Eddie Martin that she was leaving PCNA to work as Vice President of Strategy at iClick.

35.     In an email to Mr. Martin following up on their conversation, Ms. Hare stated that she agreed not to contact any of PCNA's customers with whom she had worked while at PCNA. To the email, she attached a list of such customers. Ms. Hare generated this list by "clipping" into that document certain identifying fields from a PCNA report that contained other customer-specific sales information, though she did not copy, download, or otherwise save the other information contained in the report as to the entities on the list she generated. Ms. Hare copied her personal email address on this email.

36.     At some time near her resignation, Ms. Hare also shared this list with iClick's Chief Executive Officer—Jeffrey Roberts—and iClick's corporate counsel. Ms. Hare testified that she did this so that Mr. Roberts and iClick's counsel could determine her obligations under the Employment Agreement.

37.     Ms. Hare testified that, other than this list, she did not copy, download, save, or secret away other information from PCNA's systems.

38.     Mr. Roberts testified that he asks his employees not to share information about their prior employers while working for iClick.

## II.    Legal Standard

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 290 F.3d 578, 586 (3d Cir. 2002)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). While all

four factors are important, the first can be dispositive. "The moving party's failure to show a likelihood of success on the merits 'must necessarily result in the denial of a preliminary injunction.'" *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)).

## III.    Discussion and Conclusions of Law

### A.    Likelihood of Success on the Merits

"On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability[] of winning." *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 256 (3d Cir. 2020). In its briefing on the instant motion, Plaintiff groups its claims into two categories: breach of contract and misappropriation of trade secrets. Defendants do the same. The Court will follow the Parties' lead.

### 1.    Breach of Contract

To make out a claim for breach of contract, a party must establish: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. Ct. 2013).

Plaintiff has demonstrated the existence of a contract. Plaintiff made an offer when it provided the Employment Agreement to Ms. Hare. Ms. Hare accepted when she signed the Agreement. And the Employment Agreement is supported by consideration. According to the Agreement, Ms. Hare assumed the obligations of the agreement "[i]n consideration of the Company's agreement to employ Employee in an at-will capacity in the position of 'Regional Sales Manager' and other good and valuable consideration as set forth herein." (Plaintiff's Ex. 9, at 1). Defendants concede that Ms. Hare's move from National Account Manager to Regional Sales Manager was a promotion, (*see* ECF No. 16 ¶¶ 12-13), and under Pennsylvania law, this

alone is enough. A promotion is sufficient consideration. *Recs. Ctr., Inc. v. Comprehensive Mgmt., Inc.*, 525 A.2d 433, 435 (Pa. Super. Ct. 1987) ("An employee's promotion to a new position within the company also constitutes sufficient consideration."); *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 126 A.3d 1266, 1275 (Pa. 2015). This is true even if the new position is at-will. *See Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838, 846 n.14 (Pa. 1957).[3]

As to breach, Plaintiff claims that Ms. Hare has violated or will violate her Employment Agreement in three ways: (1) she took a job with a competitor within twelve months of leaving Plaintiff's employ; (2) she will inevitably solicit Plaintiff's customers; and (3) she will inevitably misuse or disclosure Plaintiff's proprietary information. Before addressing each of these alleged breaches, the Court must resolve whether Ms. Hare was relieved of her obligations under the Employment Agreement when Plaintiff changed Ms. Hare's commission structure in a way that may have decreased her compensation.[4]

The Court concludes that Ms. Hare was not thereby relieved of those obligations. The Employment Agreement provides that Ms. Hare's employment with Leedsworld was at-will. (Plaintiff's Ex. 9 ¶ 12). At-will employees may be fired at any time for almost any reason, *Rothrock v. Rothrock Motor Sales, Inc.*, 883 A.2d 511, 512 n.1 (Pa. 2005), and their compensation may be changed prospectively at the employer's discretion, *Hicks v. Glob. Data Consultants, LLC*, 288

---

[3] At the evidentiary hearing and oral argument, the Court expressed concerns about the timing of Ms. Hare's execution of the Employment Agreement and her actual receipt of the promotion and corresponding raise. Upon further review, the Court concludes any gap between Ms. Hare's execution of the Employment Agreement and Hare's receipt of the promotion would not affect the Court's analysis. Plaintiff's promise to promote Ms. Hare was valuable consideration. Had Plaintiff not promoted Ms. Hare, it may have been in breach, but that is a separate question.

[4] Ms. Hare believed that the new system would reduce her compensation. Mr. Peterson testified that the new compensation agreement could reduce her compensation, but it could also increase that compensation: the new structure was intended to offer "more upside and more at risk on the down side."

A.3d 875, 886 (Pa. Super. Ct. 2022) ("[B]ecause Hicks was an at-will employee, there was nothing prohibiting GDC from prospectively changing the commission schedule.").[5] Accordingly, Plaintiff's change to the compensation structure did not constitute a material breach and therefore does not excuse Ms. Hare's obligations under the Agreement. The Court will now evaluate each alleged breach in turn.

### i.    Covenant Not to Compete

Plaintiff argues that Ms. Hare breached the Employment Agreement by working for a competitor within twelve months of leaving Plaintiff's employment. The Employment Agreement contains a covenant not to compete ("Non-Competition Covenant"). That covenant provides:

> during the term of an Employee's employment with any Company Entity and for a period of twelve (12) months thereafter (the "Restricted Period"), regardless of the reason for the termination of the employment relationship, Employee will not directly or indirectly, whether as owner, partner, shareholder, director, manager, consultant, agent, employee, co-venturer or otherwise, anywhere in any Territory (as defined below), engage, participate or invest in, or prepare to engage, participate or invest in: (i) any business engaged in the selling, sourcing, decorating, printing and/or marketing of any promotional products and/or print on demand products that are competitive with the products of the Company or any other Company Entity; or (ii) any other business activity that is competitive with any business activity of the Company or any other Company Entity, or with any business activity that the Company or any other Company Entity is actively planning to engage in during Employee's employment with any Company Entity.

(Plaintiff's Ex. 9 ¶ 6(b)). Ms. Hare took a position as an employee of iClick. She took this position within twelve months of leaving PCNA. Though there is disagreement over the extent of the competition, iClick sells at least some promotional products that are competitive with PCNA's.

---

[5] Plaintiff's ability to prospectively change the compensation structure does not render the consideration "illusory." Defendants' argument, if accepted, would render all at-will employment "illusory" consideration, and Pennsylvania courts have taken the opposite position. *Morgan's Home*, 136 A.2d at 846 n.14 ("The taking of employment which is terminable at will affords a sufficient 'principal transaction' or 'consideration' to support a restrictive agreement made by an employe.").

Both iClick and PCNA, for instance, sell promotional phone chargers and power banks. Accordingly, Ms. Hare's employment with iClick facially violates the language of the Non-Competition Covenant.

The question then becomes whether the Non-Competition Covenant is enforceable. Under Pennsylvania Law, restrictive covenants like the Non-Competition Covenant are disfavored. *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917 (Pa. 2002). These covenants are enforceable only if "they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." *Id.* (citing *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 252 (Pa. 1976)). The party seeking to avoid performance—here, Ms. Hare— bears the burden of demonstrating unreasonableness. *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. Ct. 2005).

Defendants concede that the Non-Competition Covenant was incident to an employment relationship between the parties. (ECF No. 15 at 6). Defendants also do not contest the reasonableness of the Covenant's duration, and for good reason. Courts applying Pennsylvania law routinely uphold twelve-month restrictions. *See, e.g.*, *Nat'l Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998). This leaves whether the Non-Competition Covenant is "reasonably necessary" to protect Plaintiff's interests and whether it is reasonably limited in geographic scope. The Court concludes that it is neither.

No doubt that Plaintiff has legitimate business interests in the safeguarding of its trade secrets and confidential information, the preservation of business goodwill, and the protection of extraordinary skills and specialized training it provides to its employees. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 424 (3d Cir. 2010). And no doubt that Plaintiff may enter into

non-competition agreements with its employees to protect these interests. But the question before the Court now is whether the Non-Competition Covenant that Ms. Hare signed was "reasonably necessary" for the protection of these interests. *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 569 (M.D. Pa. 2014) ("Thus, recognition of Wells Fargo's legitimate interests does not end the court's inquiry, because the [agreement] must be narrowly tailored to protect its articulated interests."). From the Court's review of the record before it at this point, the Court concludes that the Non-Competition Covenant is not sufficiently "tailored" to protect Plaintiff's interests and is therefore unenforceable. *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007), *as amended* (Nov. 20, 2007).

Under the Non-Competition Covenant, during the twelve months that the covenant applies, Ms. Hare may not:

(1) "directly or indirectly . . . engage, participate or invest in, or prepare to engage, participate or invest in . . . any business engaged in the selling, sourcing, decorating, printing and/or marketing of any promotional products and/or print on demand products that are competitive with the products of the Company or any other Company Entity"; nor

(2) "directly or indirectly . . . engage, participate or invest in, or prepare to engage, participate or invest in . . . any other business activity that is competitive with any business activity of the Company or any other Company Entity, or with any business activity that the Company or any other Company Entity is actively planning to engage in during Employee's employment with any Company Entity."

(Plaintiff's Ex. 9 ¶ 6(b)). The geographic scope of these restrictions is nearly unlimited. They apply to every place in which "any Company Entity" (i.e., any company in the PCNA corporate family) is "actively engaged or conducting business or has an interest in a business entity which is actively engaged or conducting business as of the date of the termination" of Ms. Hare's employment. (Plaintiff's Ex. 9, at 6). PCNA's corporate affiliates do business throughout the entire world, in "many" countries across "several" continents.

12

The geographic breadth of this restrictions, in and of itself, does not make these covenants unenforceable. *Victaulic*, 499 F.3d at 237. Even broad restrictions may be enforceable if they are "roughly consonant" with the employee's duties. *Id.* But based on the evidence before the Court at this juncture, the functionally global Non-Competition Covenant is not "roughly consonant" with Ms. Hare's employment. *Id.* Ms. Hare's work for PCNA—and her knowledge of confidential information and development of business goodwill—was concentrated in the Midwest region of the continental United States and, by broadest account, reached across the United States and into Canada. This concentration notwithstanding, the Non-Competition Covenant limits Ms. Hare's ability to find employment in the "many" countries across "multiple" continents where PCNA corporate affiliates operate. *See Adhesives Rsch., Inc. v. Newsom*, No. 1:15-CV-0326, 2015 WL 1638557, at *6 (M.D. Pa. Apr. 13, 2015) (declining to enforce a global restrictive covenant where the employee's duties were limited to the western United States); *cf. Nat'l Bus. Servs.*, 2 F. Supp. 2d at 708 (enforcing nationwide covenant where employer had "extensive contacts with customers all over the nation"); *Graphic Mgmt. Assocs., Inc. v. Hatt*, No. 97-CV-6961, 1998 WL 159035, at *14 (E.D. Pa. Mar. 18, 1998) (enforcing a restrictive covenant that applied to North America were the defendant's work involved clients throughout North America).

This geographic overbreadth is exacerbated by the scope of the restrictions themselves. The Non-Compete Covenant prohibits Ms. Hare from finding employment with any company that engages in any "business activity that is competitive with any business activity of the Company or any other Company Entity, *or with any business activity that the Company or any other Company Entity is actively planning to engage in*." (Plaintiff's Ex. 9 ¶ 6(b)) (emphasis added). The restriction applies beyond the promotional-products industry, even though it appears that Ms. Hare's work for PCNA, her interactions with customers, and her access to confidential information were limited

13

to the promotional-products industry.[6] It applies to any company that competes with any corporate affiliate of PCNA, even though there is nothing in the record to indicate that Ms. Hare was exposed to customers or confidential information of PCNA's corporate affiliates. And it applies to companies that are involved in any activity that any PCNA corporate affiliate was merely planning to engage in, whether or not Ms. Hare was involved in or even knew about that activity.

For these reasons and based on the record before it at this time, the Court concludes that the Non-Competition Covenant is unreasonably overbroad in geographic scope and not reasonably necessary for the protection of PCNA's legitimate business interests.

This does not end the inquiry. In Pennsylvania, when faced with an overbroad covenant, "a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer," *Sidco*, 351 A.2d at 254 (citing cases), but it need not do so in every case, *see Martin Indus. Supply Corp. v. Riffert*, 530 A.2d 906, 908 (Pa. Super. Ct. 1987) (reasonable for trial court to refuse to rewrite overbroad noncompetition agreement); *Pittsburgh Logistics Sys., Inc. v. Ceravolo*, No. 135 WDA 2017, 2017 WL 5451759, at *7 (Pa. Super. Ct. Nov. 14, 2017) ("[W]e know of no authority that mandates a court modify the contract."). In particular, "gratuitous over-breadth militates against any enforcement whatsoever." *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 220 (3d Cir. 2010). Such overbreadth "indicates an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose." *Sidco*, 351 A.2d at 257.

In the present case, the Court declines to reform the overbroad Non-Competition Covenant, concluding on this record that it would be inequitable to do so. Though the geographic limitations

---

[6] The Non-Competition Covenant contains a separate specific prohibition on working in the promotional-products industry.

of Ms. Hare's work may not have been as clear as those of the salesman in *Adhesives Research., Inc. v. Newsom*, No. 1:15-CV-0326, 2015 WL 1638557 (M.D. Pa. Apr. 13, 2015), the geographic overbreadth of the Covenant would have been apparent at the time of execution. Ms. Hare was being promoted into the role of *Regional* Sales Manager for Polyconcept *North America*, and yet the Covenant's geographic scope was functionally worldwide. The Covenant's overbreadth in terms of industry and scope would also have been reasonably foreseeable at the time of execution. Its language, taken at face value, would bar Ms. Hare from working for any business enterprise engaged in any business activity that any subsidiary of PCNA was simply planning to engage in. This kind of foreseeable overbreadth demonstrates a restrict-first, narrow-later approach that this Court is reluctant to countenance. Reforming such agreements "encourage[s] employers and purchasers possessing superior bargaining power over that of their employees and vendors to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise may be upheld in part, if not in full." *Reading Aviation Serv., Inc. v. Bertolet*, 311 A.2d 628, 630-31 (Pa. 1973).

Given the covenant's facially foreseeable overbreadth as to geography and scope, the Court declines to exercise its equitable discretion to reform the Non-Competition Covenant. *See Pittsburgh Logistics Sys, Inc. v. Ceravolo*, 2016 WL 11789289 (Pa. C.P. Civil Div. Dec. 22, 2016); *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 936 (Pa. 2021) (declining to enforce no-hire covenant because it "was meant to have effect in the broadest possible terms" despite underlying legitimate business interest).[7]

---

[7] The Employment Agreement's severability clause does not change the Court's analysis. This provision provides:

> If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be revised and/or construed in a manner

For these reasons, the Court concludes that Plaintiff has not demonstrated that it is likely to succeed on the merits of its breach of contract claim with respect to the Non-Competition Covenant.

### ii.    Covenant Not to Solicit[8]

The Employment Agreement also contains a covenant not to solicit Plaintiff's customers ("Non-Solicitation Covenant"). That covenant provides:

> all times during the Restricted Period, Employee will not, directly or indirectly, or by action in concert with others . . . call upon, contact, encourage, handle, solicit or induce or attempt to induce any customer, vendor or other Person having a business relationship with the Company or any other Company Entity to reduce or cease doing business with the Company or any other Company Entity, . . . [or] prepare to do any of the foregoing.

(Plaintiff's Ex. 9 ¶ 6(b)). Nothing in the record suggests that Non-Solicitation Covenant is unenforceable. It was part of the Employment Agreement, which was supported by consideration. Moreover, covenants—like this one—"which temporarily limit a former employee's ability to solicit his former customers and coworkers have long been enforced by Pennsylvania courts." *Diodato*, 44 F. Supp. 3d at 569.

---

that will reasonably protect the Company's legitimate business interests to the maximum extent allowed by law or equity.

(Plaintiff's Ex. 9 ¶ 9). In *Pittsburgh Logistics Sys., Inc. v. Ceravolo*, No. 135 WDA 2017, 2017 WL 5451759 (Pa. Super. Ct. Nov. 14, 2017), the court evaluated a nearly identical provision and concluded that this clause merely recognized the court's equitable power to reform the agreement and demonstrated the employee's acceptance of the court's power to do so. *Id.* at *7. Reading such a provision to require the reformation of the contract would, in effect, render the provision unchallengeable. *Id.* Further, the court reasoned that "the power to amend a contract in such a manner is equitable, and we know of no authority that mandates a court modify the contract." *Id.* This Court agrees and declines to reform the Non-Competition Covenant, the severability clause notwithstanding.

[8] The Parties did not separately brief whether, in the absence of an enforceable covenant not to compete, the Non-Solicitation Covenant would provide a stand-alone basis for enjoining Ms. Hare from working for iClick. For the sake of completeness, the Court will address this issue.

The question becomes whether Ms. Hare is likely to breach the Non-Solicitation Covenant. Plaintiff argues that Ms. Hare will inevitably violate the Non-Solicitation Covenant if she is permitted to work at iClick, even if she does not interact directly with customers. Plaintiff argues that: Ms. Hare's role at iClick is Vice President of Strategy; in this role, she will develop iClick's strategy to increase sales to iClick's customers; iClick and PCNA are both in the promotional-products industry and have some of the same customers; increasing iClick's sales will come at PCNA's expense; therefore, by developing strategy to increase iClick's sales, Ms. Hare will necessarily be indirectly soliciting PCNA's customers in violation of the Non-Solicitation Covenant.

Based on the record now before it, the Court cannot agree. <u>First,</u> at this point, what Ms. Hare will do at iClick remains unclear. Ms. Hare testified that she will be directing strategy to increase sales. But according to Mr. Roberts, who presumably has the clearest understanding of what he hired Ms. Hare to do, Ms. Hare's role will not involve developing customer-specific strategy. Rather, as Mr. Roberts testified, Ms. Hare's role will involve looking at iClick's structure, organization, and operations. For example, iClick does not currently have an operational customer relationship manager or management system. This kind of operation planning would not necessarily or inevitably violate the Non-Solicitation Covenant.

<u>Second,</u> even if it does turn out that Ms. Hare's role involves developing a general strategy to increase sales, the Court is skeptical that this falls within the Non-Solicitation Covenant's prohibition. Persons bound by restrictive covenants cannot use third parties to avoid their obligations. But for the Court to find that a former employee "indirectly solicited" a customer of his previous employer, that employee must "make specific acts of personal involvement in the solicitation." *Ecosave Automation, Inc. v. Del. Valley Automation, LLC*, 540 F. Supp. 3d 491, 506

(E.D. Pa. 2021). There is no evidence Ms. Hare will undertake those specific acts in this case. Crafting general sales strategy is just too attenuated from the act of proscribed solicitation to fall within the Covenant's scope.

And <u>third,</u> to the extent that Ms. Hare's development of this kind of general strategy would violate the Covenant, the Court harbors serious doubts about whether such a restrictive covenant would be enforceable, for all the reasons discussed above. While Plaintiff certainly has an interest in preventing former employees from absconding with its customer base, *see Sidco*, 351 A.2d at 254, the Court is skeptical that such a broad covenant—unlimited in geographic scope, applying to customers of not only to Leedsworld or PCNA but to all members of the PCNA corporate family—would be "tailored" to that interest, *Victaulic*, 499 F.3d at 235.

Accordingly, based on the record before it, the Court concludes that Plaintiff has not demonstrated that Ms. Hare is likely to violate the Non-Solicitation Covenant and therefore has not demonstrated that it is likely to succeed on the merits of this claim.

### iii.    Non-Disclosure Covenant[9]

The Employment Agreement also contained a covenant not to disclose or use Plaintiff's proprietary information ("Non-Disclosure Covenant"). This covenant provides:

> Employee will not, at any time, without the Company's prior written permission, either during or after Employee's employment, disclose any Proprietary Information to anyone outside of the Company Entities, or use or permit to be used any Proprietary Information for any purpose other than the performance of Employee's duties.

(Plaintiff's Ex. 9 ¶ 2(b)).

---

[9] As with the Non-Solicitation Covenant, the Parties did not separately brief whether, in the absence of an enforceable covenant not to compete, the Non-Disclosure Agreement would provide a stand-alone basis for enjoining Ms. Hare from working for iClick. This said, the Court will address the Non-Disclosure Covenant separately for the sake of completeness.

Proprietary Information is defined as "all information, whether or not in writing, concerning the Company Entities' business, technology, business relationships or financial affairs, and any other business-related information that the Company Entities have not released generally within the industry or industries in which they operate." (Plaintiff's Ex. 9 ¶ 2(a)). "Customer identities" is included in the illustrative list of Proprietary Information. (Plaintiff's Ex. 9 ¶ 2(a)).

Ms. Hare arguably breached the Non-Disclosure Covenant when she disclosed the truncated list of PCNA customers, (*see* Plaintiff's Ex. 4B), to Mr. Roberts and iClick's corporate counsel. But because it seeks prospective relief, Plaintiff must demonstrate that Ms. Hare is likely to violate the agreement moving forward. *See First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235-36 (M.D. Pa. 2001) ("A preliminary injunction is not a vehicle through which a plaintiff can seek correction of past wrongs."); *Den-Tal-Ez, Inc. v. Siemens Cap. Corp.*, 566 A.2d 1214, 1232 (Pa. Super. Ct. 1989) ("Although proof of past use or disclosure may be relevant to this question, it is not a sine qua non for injunctive relief."). Plaintiff has not done so.

First, Plaintiff adduced no evidence that Mr. Roberts, iClick's general counsel, or Ms. Hare will access or use the customer list moving forward. Ms. Hare explained that she disclosed the customer list to Mr. Roberts and iClick's general counsel in order to assess her obligations under her Employment Agreement. While this reasoning may not excuse Ms. Hare's liability for damages arising out of the disclosure should such be proven, that purpose for her disclosure has now been fulfilled, suggesting that future use or disclosure of this information is unlikely. Further, Mr. Roberts credibly testified that he specifically asks his employees *not* to mention their work with their previous employers while working for iClick. Finally, given iClick's 38,000 customers across 13,000 customer companies, it is not clear from the record how the list of two hundred or

so PCNA customers would be of use to iClick (or was not already well known to iClick), further mitigating the risk of future use.

Second, beyond the customer list, Ms. Hare testified that she has no continued access to Plaintiff's confidential information. As discussed above, while the Court does not doubt Ms. Hare's mental acuity, the Court received no evidence that Ms. Hare has a Henner-like[10] capacity for memorization. Accordingly, the Court is skeptical that Ms. Hare would be able to commit granular sales data—like that contained in the spreadsheet from which she extracted and then constructed the involved customer list but which she did not copy—to memory, and that she had done so.

Third, regarding the use or appropriation of broader non-technical information like sales strategies that is more likely to be committed to memory, the Court cannot conclude that it is likely that Ms. Hare will is likely to use or disclose this kind of information in the course of her employment with iClick. For one, it is not clear that it will be relevant to iClick. While both iClick and PCNA are suppliers of promotional products, the actual extent of their competition is somewhat more limited. At present, iClick's business is overwhelming concentrated in non-audio mobile technology (cellphone holders and "buttons" affixed to the back of a cell phone case to facilitate the holder's grasp on the cellphone while taking a "selfie," for instance). According to Mr. Peterson's testimony, these products make up only small percentage—around five percent—of PCNA's business. Competition between iClick and PCNA is further mitigated by the fact that around sixty percent of iClick's revenue is generated from the sales of products for which iClick has exclusive dealing contracts. Moreover, it is not clear that this information will be relevant to

---

[10] Marilu Henner, the actress best known for her role as Elaine Nardo in *Taxi*, has a "highly superior autobiographical memory." *See generally* Carrie Golus, *Permanent Record*, The Core, Summer 2013, *available at* https://perma.cc/3595-8TF6.

Ms. Hare's role at iClick. As discussed above, the contours of Ms. Hare's role at iClick are still developing. Without knowing more about what Ms. Hare will actually do at iClick, the Court cannot conclude that there is the kind of "significant overlap" between her position at PCNA and her role at iClick that would suggest disclosure is likely. *Cerro Fabricated Products LLC v. Solanick*, 300 F. Supp. 3d 632, 637, 639 (M.D. Pa. 2018).[11]

And <u>fourth,</u> as with the Non-Solicitation Covenant, adopting a broad reading of the Non-Disclosure Covenant and seeking to enforce it through injunctive relief would functionally convert it into a general covenant not to compete. As with the Non-Solicitation Covenant, the Court harbors serious doubts that such a general restrictive covenant—unbounded by time or geography—would be enforceable.

For these reasons, the Court concludes that Plaintiff has not demonstrated a likelihood of success on the merits with respect to the Non-Disclosure Covenant.

### 2.    Misappropriation of Trade Secrets

Plaintiff is also not likely to succeed on the merits of its trade-secret misappropriation claims. With one exception, Plaintiff has failed to sufficiently describe the information for which it seeks protection. As to the information that was sufficiently described, Plaintiff has failed to demonstrate that there is a substantial likelihood of future misappropriation.

---

[11] The instant case strikes the Court as somewhat unlike *Cerro Fabricated Products LLC v. Solanick*, 300 F. Supp. 3d 632 (M.D. Pa. 2018). There, the court concluded that misappropriation of trade secrets was likely because the two companies directly competed in the "narrow" and "niche" market of aluminum-brass firearm components and because the employee's role at each company was similar. *Id.* at 637-39. Though *Cerro* addressed inevitable disclosure of trade secrets, the Court finds comparison to *Cerro* useful as the Court does not perceive a meaningful difference between the inevitable-disclosure analysis and the analysis of whether breach of a confidentiality agreement is likely.

To make out a claim for the misappropriation of trade secrets under Pennsylvania law, Plaintiff will need to prove: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 F. App'x 962 (3d Cir. 2010) (quoting *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003)). The elements of a federal trade-secrets claim are largely the same, with the additional requirement that the secret be related to interstate commerce. *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) ("(1) the existence of a trade secret . . . (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce[,] and (3) the misappropriation of that trade secret."). A trade secret is information that "(1) Derives independent economic value . . . from not being generally known . . .  and (2) is the subject of efforts that are reasonable under the circumstances to maintain is secrecy." 12 Pa. C.S. § 5302; *see* 18 U.S.C. § 1839(3).

The first step in bringing a claim under either state or federal law is sufficiently identifying the information claimed as a trade secret. *Oakwood Lab'ys*, 999 F.3d at 905; *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 (3d Cir. 2021) ("We cannot evaluate whether a plaintiff is likely to succeed on any element of a trade secret misappropriation claim until the plaintiff has sufficiently described those trade secrets."). The plaintiff need not spell out the details, but the secret must be described with "sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Mallet*, 16 F.4th at 382.

Plaintiff stumbles at this first hurdle. Plaintiff appears to argue that the following information qualifies as a trade secret: "customer names and contacts; pricing information;

customer sales level spending; marketing strategies, sales strategies, sales staff design; compensation information; strategic plans and account planning processes; and internal cost information." (ECF No. 1 ¶ 26). In its Brief in Support, Plaintiff describes the confidential information for which it seeks protection as including "compilations of key customer data including contact information, sales history, targets, and projections, strategic product, and benefits offerings, marketing materials, pricing information, and other information about Leedsworld's customers." (ECF No. 3 at 14).

This "list of general categories of business and technical information . . . falters against the standard for specifying a trade secret." *Mallet*, 16 F.4th at 382. With one exception, Plaintiff fails to describe the information for which protection is sought with enough detail for the Court to evaluate whether that information is entitled to trade secret protection. Take "sales staff design" as just one example. Mr. Peterson testified Ms. Hare would have insight into how Leedsworld built out its national accounts manager model. But the general concept of a national accounts manager is generally known and is not a trade secret. *See Nat'l Bus. Servs.*, 2 F. Supp. 2d at 705 (describing defendant's role as "National Account Manager"). There may be aspects of Plaintiff's national accounts manager model that are not generally known and qualify as a trade secret, but Plaintiff has not told the Court what they are—even in a general sense.

The only confidential information that was described in any particular detail was the monthly report from which Ms. Hare generated the customer list. The information contained in this spreadsheet likely constitutes a trade secret. Even though the identity of distributors in the promotional products industry is generally known, the information contained on this spreadsheet went beyond mere customer identity. According to Mr. Peterson, that source spreadsheet identified Leedsworld's customers and contained customer-level sales data, contact information for those

customers account representatives, as well as information about the kinds of products that each customer bought. Mr. Peterson testified that the compilation of this data was not generally known and was compiled by Plaintiff at significant expense. Moreover, it appears likely that Plaintiff took reasonable measures to keep this information private: Plaintiff required persons accessing it to sign non-disclosure agreements. Accordingly, it is likely that this information meets the definition of a trade secret. *See Morgan's Home Equip.*, 136 A.2d at 842.

But establishing the existence of a trade secret is only the first step in the analysis. To obtain equitable relief, the plaintiff must demonstrate that there is a substantial threat that defendant will use or disclose this information in the future. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 114 (3d Cir. 2010) (A defendant may be enjoined from engaging in certain employment where there is a "'sufficient likelihood or substantial threat' that the defendant will disclose plaintiff's trade secrets in the course of that employment."); *Den-Tal-Ez*, 566 A.2d at 1232. Plaintiff has not done so. Although Ms. Hare has already disclosed some of the information to iClick (i.e., the customer list in Plaintiff's Ex. 4B), Plaintiff has not demonstrated that there is a substantial threat of future misuse or disclosure.

First, Ms. Hare explained that she sent the customer list (which, recall, was a truncated set of information from the PCNA document, and not including sales/financial data) to herself and iClick so that she would be able to comply with the Non-Solicitation Covenant. While this excuse may not immunize her from liability for damages, it does suggest that—now that this purpose has been satisfied—future use or misuse is less likely.

Second, and more importantly, Ms. Hare testified credibly that—other than the customer list—she does not have continued access to the confidential information. She testified that she did not download, print, or otherwise secret away other information from Plaintiff's systems, including

the other sales and customer information that was on the spreadsheet from which she created the customer list. While theoretically possible, the Court doubts that Ms. Hare committed the spreadsheet to memory before leaving Plaintiff's employ. *CentiMark Corp. v. Jacobsen*, No. CIV.A. 11-1137, 2011 WL 5977668, at *14 (W.D. Pa. Nov. 29, 2011) ("[W]e conclude, as did the court in *Oberg*, that these reports, to the extent they contained confidential information, 'were so voluminous that they could not have been committed to memory.'" (quoting *Oberg Indus., Inc. v. Finney*, 555 A.2d 1324, 1327 (Pa. Super. Ct. 1989))). Moreover, at a minimum, the fact that she did not take other information with her suggests that she does not intend to misuse Plaintiff's protectible trade secrets. *See Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 804 (E.D. Pa. 2011).

Therefore, the Court concludes that Plaintiff has not demonstrated that it is likely to succeed on the merits of their claim for injunctive relief on the basis of Defendants' misappropriation of trade secrets.

### B.    Irreparable Harm[12]

The party moving for a preliminary injunction must show "a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). The mere possibility of harm is not enough; rather, the harm must be "likely to occur in the absence of an injunction." *Ramsay*, 968 F.3d at 262.

The Court concludes that Plaintiff has failed to establish that it is likely to suffer irreparable harm in the absence of an injunction. Loss of trade and goodwill, misappropriation of trade secrets or confidential information, and solicitation of customers may all be injuries for which money

---

[12] The Court's conclusion that Plaintiff has not demonstrated a likelihood of success on the merits is sufficient for the Court to deny Plaintiff's Motion. *See Am. Exp.*, 669 F.3d at 366. For completeness, the Court will nevertheless evaluate the remaining three factors.

damages are inadequate. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998); *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977). But as discussed at length above, Plaintiff has not demonstrated that Ms. Hare is likely to violate the Employment Agreement or that Defendants are likely to misappropriate Plaintiff's trade secrets. To the extent that Ms. Hare has already violated the Non-Disclosure Covenant by sharing the customer list with two people affiliated with iClick, this harm has already occurred. Past harm cannot support the issuance of a forward-looking preliminary injunction. *Garrett v. PennyMac Loan Servs.*, No. 3:18-CV-00718, 2018 WL 2981266, at *3 (M.D. Pa. June 14, 2018) (compiling cases); s*ee also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992) ("A threat of disclosure may establish immediate irreparable harm but 'further' disclosure of something already revealed cannot."). And the record does not support a conclusion that Defendants will misuse this information for their own benefit or in a fashion that harms Plaintiff moving forward.

### C.      Balance of Equities

The Court must now balance "the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). As discussed above, Plaintiff has not established that it is likely to suffer irreparable harm in the absence of an injunction. If an injunction is entered, Ms. Hare will be prevented from earning a livelihood by working in her chosen profession. Though Ms. Hare's lost wages and other economic injury could be recovered through money damages, "even a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him." *Bimbo Bakeries*, 613 F.3d at 119.

Accordingly, the Court concludes that the balance of the equities counsels against entering a preliminary injunction.

### D.    Public Interest

Finally, the Court concludes that entering a preliminary injunction would not be in the public interest. In cases like this one, the Court is tasked with balancing "the right of a business person to be protected against unfair competition . . . against the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he or she is best suited." *Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1347 (Pa. Super. Ct. 1995). The public has a strong interest in enforcing valid contracts and in protecting trade secrets and other confidential information. *See Bimbo Bakeries*, 613 F.3d at 119. But the public also has a strong interest in employee mobility and unrestrained competition. *See Wexler v. Greenberg*, 160 A.2d 430, 433-35 (Pa. 1960).

Here, Plaintiff has not demonstrated that it is likely to face unfair competition or that its confidential information will likely be disclosed. If the Court declines to enter an injunction, those public interests will not be implicated. On the other hand, if the Court were to enter an injunction, the public interest in employee mobility and free competition would be harmed.

Therefore, under these specific circumstances and on the record now before it, the Court concludes that public interest weighs against entering an injunction.

### IV.    Conclusion

Based on the current record, Plaintiff has not demonstrated that the extraordinary remedy of a preliminary injunction is warranted.

An appropriate Order will issue.

 s/ Mark. R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: March 21, 2025